UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOHNNIE F. MILLER, JR., )
)
    *Plaintiff* )
)
v. ) No. 2:10-cv-43-DBH
)
MICHAEL J. ASTRUE, )
**Commissioner of Social Security,** )
)
    *Defendant* )

## *REPORT AND RECOMMENDED DECISION*[1]

This Social Security Disability ("SSD") appeal raises the question of whether the commissioner supportably found the plaintiff, who alleges that he is disabled by borderline intellectual functioning, impingement syndrome of the right shoulder, cervical degenerative disc disease, post-concussion syndrome, a learning disability, a brain injury, and headaches, capable of performing work existing in significant numbers in the national economy. I recommend that the decision of the commissioner be vacated and the case remanded for further proceedings.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. § 405.101 (incorporating 20 C.F.R. § 404.1520); *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff last met the insured status requirements of the Social Security Act on December 31, 2006, Finding 1, Record at 9; that, through his date last insured, he had severe impairments of right

---

[1] This action is properly brought under 42 U.S.C. § 405(g). The commissioner has admitted that the plaintiff has exhausted his administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which he seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on December 17, 2010, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

shoulder degenerative joint disease and impingement syndrome, borderline intellectual functioning, and cognitive disorder, Finding 3, *id.*; that, through his date last insured, he had the residual functional capacity ("RFC") to lift and carry no more than 20 pounds occasionally and 10 pounds frequently and lift no more than 10 pounds with his right arm, sit for six hours in an eight-hour period, and stand/walk for six hours in an eight-hour period, could not push/pull with the right shoulder, crawl, or climb ladders, ropes, or scaffolds, could frequently climb ramps and stairs, balance, stoop, kneel, and crouch, could not perform overhead or above-shoulder work, and was limited to unskilled tasks with no report writing and no reading of instructions but could follow oral or demonstrated instructions and, with those limitations, could maintain concentration, focus, attention, persistence, and pace, Finding 5, *id.* at 11; that, through his date last insured, considering his age (a younger individual as of the alleged disability onset date, and age 50, defined as an individual closely approaching advanced age, as of his date last insured), education (at least high school), work experience (transferability of job skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that he could perform, Findings 7-10, *id.* at 14-15; and that he, therefore, was not disabled, as defined in the Social Security Act, from April 5, 2001, his alleged onset date of disability, through December 31, 2006, his date last insured, Finding 11, *id.* at 16. The Decision Review Board failed to review the decision within 90 days, making it the final determination of the commissioner, *id.* at 1-3; 20 C.F.R. § 405.450(b); *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. § 405(g); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must

be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than his past relevant work. 20 C.F.R. § 405.101 (incorporating 20 C.F.R. § 404.1520(g)); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

## I. Discussion

The plaintiff raises four points, arguing that the administrative law judge erred in (i) finding no limitations from neck pain and headaches, (ii) discounting his credibility solely because he received worker's compensation benefits and visited his dying mother in Arkansas, (iii) altering a limitation on reaching imposed by treating physician Donald P. Endrizzi, M.D., and (iv) failing to accept certain limitations set forth in the report of an examining neuropsychologist, Laura Slap-Shelton, Psy.D. *See* Plaintiff's Statement of Errors and Fact Sheet ("Statement of Errors") (Docket No. 10) at 3-8. I conclude, and recommend that the court find, that the administrative law judge erred in handling Dr. Endrizzi's reaching limitation and the limitations in the Slap-Shelton report, and that both errors independently warrant reversal and remand. I briefly discuss the remaining points of error, none of which I find independently warrants reversal and remand.

## A. Dr. Endrizzi's Reaching Limitation

The plaintiff sustained work-related injuries when, on April 5, 2001, he fell from an eight-foot-high scaffolding with a piece of plywood in his hands, landing on his back and right shoulder. *See* Record at 181. After undergoing two right-shoulder surgeries in 2001, he consulted Dr. Endrizzi on February 12, 2002, with complaints of ongoing pain on a daily basis. *See id*. at 299. Dr. Endrizzi performed surgery on his right shoulder on May 8, 2002, to repair a torn rotator cuff and perform lysis of adhesions and diagnostic arthroscopy. *See id*. at 286, 288. Dr. Endrizzi continued to follow the plaintiff through at least July 31, 2007, submitting annual M1 Practitioner's Reports to the Maine Workers' Compensation Board. *See, e.g., id*. at 265-66.

As of June 10, 2003, Dr. Endrizzi assessed the plaintiff as having the following permanent right arm restrictions: no above-shoulder work, no push/pull or repetitive reaching, and no lifting more than five to 10 pounds. *See id*. at 274. Every year thereafter through 2007, after examining the plaintiff and reassessing his condition, Dr. Endrizzi indicated that these restrictions remained in place, with one minor modification in 2004, in which he restricted the plaintiff from lifting more than seven to 10 pounds with his right arm. *See id*. at 272; *see also id*. at 266, 268, 270.

In formulating permanent restrictions in 2003, Dr. Endrizzi noted that an MRI had revealed some mild degenerative change at the glenohumeral joint and some thinning of the rotator cuff. *See id*. at 273. He wrote: "At this point, [the plaintiff] has a problem without a great solution. He has ongoing discomfort on a daily basis. He has ongoing problems with his shoulder and with his cervical spine. I do not think that any further surgery is indicated. I do not think after three surgeries that there is any further correction that can be performed regarding his shoulder." *Id*. He described his plan for the plaintiff as follows: "At this point I have suggested

he stay on a permanent work restriction, no work above the shoulder level, no lifting more than 5 or 10 pounds, and no repetitive reaching or push-pull activities." *Id*.

The administrative law judge wrote of the Endrizzi restriction:

> I have given significant weight to the treating source medical opinion of Dr. Endrizzi and have incorporated his assessed limitations of no above shoulder work, no pushing or pulling, no repetitive reaching and no lifting more than 10 pounds with the right arm into the above residual functional capacity. As supported by his treatment notes and the overall evidence, no repetitive reaching is no repetitive reaching overhead and no pushing/pulling with the right upper extremity.

*Id*. at 13 (citation omitted).

The plaintiff argues, and I agree, that the administrative law judge's modification of Dr. Endrizzi's limitation against repetitive reaching is unsupported by substantial evidence. *See* Statement of Errors at 5-6. As an initial matter, there is no reason to think that Dr. Endrizzi did not mean exactly what he said: that the plaintiff could not perform repetitive reaching (in any direction) with his right arm. Had he meant to preclude the plaintiff from repetitive reaching *overhead*, his separate restriction against above-shoulder work seemingly would have been redundant. Moreover, the administrative law judge failed to specify which portions of Dr. Endrizzi's notes, or of other evidence of record, indicate the implicit additional limitation.[2] On careful review, I find no such implicit additional limitation in Dr. Endrizzi's notes and only superficial support for such a modification in the RFC opinions of Disability Determination

---

[2] At oral argument, counsel for the commissioner pointed to page 272 of the record for the proposition that the first restriction set down by Dr. Endrizzi, "no above shoulder work[,]"modified the second, "no push/pull, repetitive reaching[.]" Record at 272. I disagree. On the cited form, as on others of record, Dr. Endrizzi sets forth three restrictions, each of which occupies its own line, reinforcing the notion that each is a stand-alone restriction. *See id*. In addition, as noted above, if the restrictions were construed as the commissioner urges, the second restriction would be redundant.

5

Services ("DDS") nonexamining consultants Paul Stucki, M.D., and Donald Trumbull, M.D., *see* Record at 318, 357, and, on close examination, even that support evaporates.[3]

Both Drs. Stucki and Trumbull checked a box on their RFC assessment forms indicating that the plaintiff was limited in reaching all directions (including overhead); however, each was asked to describe how the activities checked "limited" were impaired. Dr. Stucki responded that the plaintiff was precluded from right shoulder overhead reaching/work, *see id*. at 318, and Dr. Trumbull responded that he was precluded from overhead work, *see id*. at 357. Nonetheless, Dr. Trumbull also indicated that nothing in his RFC opinion differed significantly from that of Dr. Endrizzi, *see id*. at 360, and Dr. Stucki indicated that his conclusions differed significantly, but only with respect to any possible left arm limitations: "For the time period in question, some limitations that relate to the right shoulder are appropriate and no doubt some would continue for some time. But for the same time period being considered, the left shoulder has remained entirely normal[,]" *id*. at 321. At bottom, Drs. Stucki and Trumbull neither explicitly indicated disagreement with Dr. Endrizzi's finding that the plaintiff was precluded from repetitive reaching with his right arm *in any direction* nor offered any reasoned explanation for such a disagreement, if one existed.

The administrative law judge hence failed to provide the requisite "good reasons" for rejection of a treating source opinion on the issue of RFC. *See* 20 C.F.R. § 404.1527(d)(2) (commissioner must "always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [a claimant's] treating source's opinion").

---

[3] Dr. Endrizzi's notes of annual examinations in July 2006 and July 2007 suggest that, while the plaintiff experienced significant pain at or above shoulder level, his strength overall was decreased by discomfort in 2006, and he had pain with resisted internal and external rotation, although he appeared to have good strength, in 2007. *See* Record at 265, 267. These findings would seem to support a limitation against repetitive reaching in any direction with the right arm.

6

The error is not harmless. Based on vocational expert testimony in response to a hypothetical question that did not include a limitation against repetitive reaching in all directions with the right arm, the administrative law judge found the plaintiff capable of performing the representative jobs of cleaner, Dictionary of Occupational Titles (U.S. Dep't of Labor, 4th ed. rev. 1991) ("DOT") § 323.687-014, parking lot attendant, DOT § 915.473-010, and laundry worker, DOT § 361.687-014. *See* Record at 15-16. The DOT indicates that all three jobs require frequent reaching, *see* DOT §§ 915.473-010, 361.687-014, and 323.687-014, a demand seemingly in conflict with a bar against "repetitive" reaching, *see, e.g., Dandreo v. Astrue*, Civil No. 09-347-P-H, 2010 WL 2076090, at *4 (D. Me. May 20, 2010) (rec. dec., *aff'd* June 9, 2010) (ambiguity in whether a person restricted from "repetitive" fine manipulation could perform work described in DOT as requiring frequent fine fingering precluded administrative law judge from relying on the testimony of a vocational expert to carry the commissioner's Step 5 burden). Indeed, when the plaintiff's counsel asked the vocational expert at hearing whether a limitation against frequent use of the right upper extremity would preclude performance of the job of cleaner, the vocational expert testified that it would. *See* Record at 50-51.[4]

---

[4] The plaintiff also complains that the administrative law judge ignored a limitation by Dr. Endrizzi to less than full-time work: 20 to 24 hours per week. *See* Statement of Errors at 6. At oral argument, I apprised the plaintiff's counsel that I had been unable to find such a restriction in the record. Counsel for the commissioner stated that she, too, had been unable to find it. When the plaintiff's counsel was unable immediately to supply a record citation, I afforded him an opportunity to do so by the close of business on Friday, December 17, 2010. On that day, he supplied a citation to page 432 of the record, noting that the reference in the official record was illegible because it was too faint. He stated that the language in his paper copy was legible and offered to supply a copy of that. At my request, the plaintiff's counsel emailed a copy of the page in question on Monday, December 20, to both the court and the commissioner's counsel. That copy, as well, was illegible. On Thursday, December 23, the plaintiff's counsel filed with the court, with copies to opposing counsel, a paper copy of the document as well as a compact disc containing it. *See* Docket No. 14. I afforded opposing counsel an opportunity to respond, and she did so on December 30. *See* Docket No. 15. The paper copy filed on December 23 contains the following phrase: [illegible] 20 24 hrs/week." *See* Docket No. 14. I agree with counsel for the commissioner, *see* Docket No. 15, that even this copy does not clearly set forth a 20 to 24 hour a week work restriction and that, in any event, it is far from clear that the administrative law judge was able to read even this much in the copy that was made part of the official record. At steps one through four, the plaintiff bears the burden of production as well as persuasion. *See, e.g., Braley v. Barnhart*, No. 04-176-B-W, 2005 WL 1353371, at *3 (D. Me. June 7, 2005) (rec. dec., *aff'd* June 24, 2005). The administrative law judge cannot fairly be said to have committed error in overlooking a work restriction so illegible
*(continued on next page)*

Reversal and remand accordingly are warranted for reconsideration of whether the opinion of Dr. Endrizzi should be modified. If the administrative law judge concludes on reconsideration that it should be, "good reasons" for that modification should be supplied. Alternatively, if he or she concludes that it should not be, a hypothetical question that includes Dr. Endrizzi's restriction as originally set forth should be posited to a vocational expert.

### B. Handling of Dr. Slap-Shelton's Report

The commissioner prescribes a psychiatric review technique that adjudicators must follow in assessing whether, at Step 2, a claimant has medically determinable mental impairment(s); if so, whether, at Steps 2 and 3, such impairments are severe and meet or equal the criteria of any impairment listed in Appendix 1 to Subpart P, 20 C.F.R. § 404 (the "Listings"), a determination arrived at with the aid of a so-called Psychiatric Review Technique Form ("PRTF"); and, if one proceeds to Steps 4 and 5, the degree to which such impairments impact RFC (a so-called mental RFC assessment). *See* 20 C.F.R. § 404.1520a.

At the PRTF stage, the severity of the impairment is assessed on the basis of rating of the degree of limitation in four broad functional areas: (i) activities of daily living, (ii) social functioning, (iii) concentration, persistence, or pace, and (iv) episodes of decompensation. *See id*. If a mental impairment is judged to be severe but not to meet or equal a Listing, assessment of a claimant's mental RFC is required; if it is judged non-severe, no mental RFC assessment need be made. *See id*.

In 2008, subsequent to his date last insured, the plaintiff was referred by a treating physician, John McGuckin, M.D., to Dr. Slap-Shelton for a neuropsychological evaluation in

---

that she cannot reasonably have been expected to detect it. *See, e.g., id*. (administrative law judge could not be faulted for failing to assign greater weight to illegible RFC opinion, no good cause having been shown for the plaintiff's failure to produce a legible copy).

order to evaluate his neurocognitive functioning. *See* Record at 338. Presenting complaints included memory problems, problems taking remedial education classes, a history of work-related injury, unemployment secondary to the injury, anxiety, depression, sleep problems, racing thoughts, unexplained rashes, discomfort around other people, and difficulties in seeking a new vocational path. *See id*. Dr Slap-Shelton assessed the plaintiff with borderline intellectual functioning, learning disorders in reading, math, and writing, and mild to moderate diffuse brain dysfunction, greater in the right hemisphere. *See id*. at 347-48. She noted that, while it was difficult to establish the effects of the plaintiff's injury on his brain functioning *versus* the effects of a developmental learning disability, he had reported altered memory functioning since the accident, and testing revealed unexpected levels of visual memory impairment and impaired visual spatial organization skills, suggesting accident-related deficits. *See id*. at 348.[5]

At Step 2, the administrative law judge found on the basis of the Slap-Shelton report that the plaintiff had medically determinable mental impairments prior to his date last insured, reasoning:

> Although the neuropsychological testing resulting in the borderline intellectual functioning and cognitive disorder, including deficits in reading, writing, and math, was performed after the date last insured, I give the [plaintiff] the benefit of the doubt that these existed on or prior to the date last insured as they most likely represent lifelong conditions.

*Id*. at 9-10 (citation omitted).

At Steps 2 and 3, using the PRTF formula, she found, in relevant part, that the plaintiff had moderate difficulties in concentration, persistence, or pace due to his intellectual and reading

---

[5] Dr. Slap-Shelton also found that testing indicated the presence of significant depression and anxiety and that the plaintiff displayed signs of bipolar disorder as well as social phobia. *See* Record at 348. The administrative law judge gave no weight to diagnoses of bipolar disorder and social phobia, which she considered unsupported for the period prior to the plaintiff's date last insured, *see id*. at 14, and he does not challenge that portion of her decision, *see* Statement of Errors at 6-8.

deficits. *See id.* at 10. She went on: "However, he was successfully employed for a number of years with these same impairments and no indication the level of limitation was any worse from the alleged onset date through the date last insured." *Id.* at 10-11.

At Step 4, the administrative law judge found the plaintiff "limited to unskilled tasks with no report writing, and no reading of instructions," although he could "follow oral or demonstrated instructions and with these limitations, [could] maintain concentration, focus[,] attention[,] persistence and pace." Finding 5, *id.* at 11. She explained, with respect to RFC, that she had given significant weight to the Slap-Shelton report "to the extent that it documents premorbid learning disorders manifested by intellectual, cognitive and reading/writing/and math deficits." *Id.* at 14 (citation omitted). She noted that she had "reduced the [RFC] consistent with the daily activities, work history despite the alleged intellectual and learning deficits, and the overall evidence for the period on or prior to the date last insured." *Id.*

The plaintiff faults the administrative law judge for ignoring mental limitations that were not lifelong but, rather, seemingly emanated from his traumatic injury. *See* Statement of Errors at 7-8. Specifically, he criticizes her failure to find that he had additional impairments in his organizational, visual, and spatial functions that caused marked impairment in concentration, persistence, and pace on the right side and moderate impairment in concentration, persistence, and pace on the left side. *See id.* at 8.

At oral argument, counsel for the commissioner did not dispute the propositions that the plaintiff's organizational, visual, and spatial impairments likely stemmed from his 2001 fall and predated his date last insured. Instead, she argued that (i) the administrative law judge's restrictions were consistent with vocational limitations set forth by Dr. Slap-Shelton, none of which were attributable to the visual/spatial impairments, and (ii) the administrative law judge

10

would have exceeded her competence as a layperson had she attempted to craft additional limitations from raw medical evidence concerning the visual/spatial impairments. However, counsel for commissioner acknowledged that the question was a close one.

I am unpersuaded that Dr. Slap-Shelton indicated that the plaintiff's organizational, visual, and spatial impairments imposed no work-related restrictions. She included several recommendations under the heading "Processing/Organization[,]" including that (i) work assignments be structured and organized with a fair amount of consistency, (ii) new information at work be presented in simple, clear language, and (iii) the plaintiff be given sufficient time to process and practice new information and routines. *See* Record at 350-51. The administrative law judge's RFC does not clearly reflect the full scope of these limitations. *Compare* Finding 5, *id*. at 11. There is no reason to expect that it would, given her indication that she intended to incorporate only limitations stemming from lifelong learning disabilities and not limitations stemming from brain trauma. While it is true, as counsel for the commissioner suggested, that the administrative law judge as a layperson was precluded from crafting an RFC based on raw medical evidence, she should have enlisted the aid of an expert who had the benefit of the Slap-Shelton report in assessing the plaintiff's mental RFC rather than ignoring apparent brain-trauma-based limitations.

The administrative law judge's failure to properly assess the impact of the Slap-Shelton report undermined the substantiality of evidence supporting her mental RFC determination. This, in turn, undermined reliance at Step 5 on vocational expert testimony predicated on the flawed RFC finding. *See, e.g., Arocho v. Secretary of Health & Human Servs*., 670 F.2d 374, 375 (1st Cir. 1982) (responses of vocational expert are relevant only to extent offered in response to hypotheticals that correspond to medical evidence of record; "To guarantee that

11

correspondence, the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions.").

## C. Remaining Points of Error

For the benefit of the parties, I briefly consider the plaintiff's remaining points of error, concluding that neither independently warrants reversal and remand.

### 1. Failure To Find Limitations Stemming from Neck Pain, Headaches

The administrative law judge declined to incorporate in her RFC a limitation against repetitive bending or twisting of the neck imposed by treating physician Michael J. Totta, M.D., primarily on the basis of the lack of an underlying medically determinable impairment. *See id.* at 13, 410. As counsel for the commissioner conceded at oral argument, in so doing, the administrative law judge erred. Diagnostic studies revealed the presence of cervical degenerative disc disease as early as 2001, well prior to the plaintiff's date last insured, and he persistently complained of, and received treatment for, neck (cervical segmental) pain. *See, e.g., id.* at 408-11, 414, 431, 458.[6] Nonetheless, as counsel for the commissioner argued, the error is harmless. When the plaintiff's attorney asked the vocational expert at hearing whether a limitation against repetitive bending or turning of the neck would affect the job of parking attendant, the vocational expert testified that such a limitation would erode approximately 50 percent of that job base, *see id.* at 58, leaving 92,500 such jobs nationally and 375 such jobs in the New England region, *see id.* at 47, 58. There is no suggestion that these numbers do not constitute a "significant" number of jobs for purposes of Step 5 analysis. Thus, even assuming

---

[6] Insofar as appears, neither Dr. Stucki nor Dr. Trumbull was provided copies of the records of Dr. Totta, his RFC opinion, or diagnostic studies corroborating the presence of cervical disc disease. *See* Record at 322, 361. Thus, to the extent that the administrative law judge relied on their opinions in declining to adopt neck-related limitations, her reliance was misplaced.

*arguendo* that the jobs of cleaner and laundry worker would have been entirely precluded by such a limitation, the error would have been harmless.

The administrative law judge found that the plaintiff suffered, prior to his date last insured, from a medically determinable impairment of headaches but judged them non-severe. *See id.* at 10. She reasoned: "Mention of headaches in the medical evidence of record is only sporadic . . . and the only medications the [plaintiff] takes for headaches are Tylenol and Motrin." *Id*. She added: "In September 2005 despite complaints of chronic neck pain and alleged headaches, the [plaintiff] declined a full medical work up to substantiate his allegations." *Id*. at 12 (citation omitted).

Reasonable minds could disagree as to whether the plaintiff's headaches were "severe" for purposes of Step 2 analysis. The characterization of the mentions of headaches in the medical records as "sporadic" is not a fair one. The plaintiff complained to Dr. Totta and other treating sources of headaches on multiple occasions, including on February 28, 2005, *see id*. at 409, May 13, 2005, *see id*. at 419, June 20, 2005, *see id*. at 414, September 9, 2005, *see id*. at 252, September 30, 2005, *see id*. at 411, November 1, 2005, *see id*. at 447, February 3, 2006, *see id*. at 445, May 24, 2006, *see id*. at 442, September 11, 2006, *see id*. at 438, and January 12, 2007, *see id*. at 434.[7] On the other hand, the record indicates that the headaches were treated with over the counter medications (Tylenol, Motrin, or Advil), *see, e.g., id*. at 23-24, 411, 414, and the plaintiff did refuse a recommended full work-up for them, albeit on the basis that he felt strongly that they were caused by neck pain, *see id*. at 252. On balance, although the question is

---

[7] At oral argument, counsel for the commissioner pointed out that the plaintiff himself had stated that he was troubled by headaches "occasionally." Record at 292. However, he was noted to have made that comment on May 8, 2002, *see id*., after which, as noted above, the frequency of his complaints of headaches increased. Counsel for the commissioner also cited page 261 of the record for the proposition that as of February 5, 2007, the plaintiff indicated that he was not suffering from headaches anymore. *See id*. at 261. However, the plaintiff merely denied a headache in the context of being treated in the emergency room for a complaint of a foreign body lodged in his right eye. *See id*. He did not indicate that he no longer suffered from headaches. *See id*.

13

a close one, the finding of non-severity is supported by substantial evidence. In any event, even assuming *arguendo* that the administrative law judge erred in failing to deem the plaintiff's headaches non-severe, the plaintiff does not identify functional limitations flowing therefrom that would have rendered their omission material for purposes of Step 5 analysis. *See* Statement of Errors at 4.

### 2. Discounting of Credibility

The plaintiff next complains that the administrative law judge erred in discounting the credibility of his complaints of disabling symptoms on the basis of his receipt of workers' compensation benefits and a trip to Arkansas to visit his mother, who was dying of cancer. *See id*. at 5.

"The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Frustaglia v. Secretary of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987).

The plaintiff was noted on September 11, 2006, to have gone to Arkansas twice that summer to visit his parents, both of whom had been diagnosed with cancer, *see* Record at 438, and on January 12, 2007, to be planning to travel to Arkansas to care for his adult son, who was "very sick" with uncontrolled diabetes mellitus, *see* Record at 434. At his hearing, the plaintiff testified that the first note was inaccurate and that he had traveled to Arkansas only once during the summer of 2006 to visit his mother, who subsequently died. *See id*. at 40-42. Regardless of whether the plaintiff took one or two trips to Arkansas in the summer of 2006, I agree that these few emergency trips to visit gravely ill or dying close relatives should not have been held inconsistent with a finding of disability.

14

That said, I find no fault in the administrative law judge's credibility assessment to the extent predicated on the receipt of workers' compensation benefits. She supportably construed the record as reflecting that the plaintiff had "reported the issue of searching for work versus losing weekly worker's compensation benefits," *id*. at 12; *compare id*. at 447 (note dated November 1, 2005, stating: "Psychosocial issues limit job search [with] potential to lose benefits."). In turn, the administrative law judge reasonably construed the plaintiff's apparent concern that finding work would result in the loss of benefits as reflecting negatively on the credibility of his allegations of disability. *See id*. at 12.[8]

Beyond this, the administrative law judge identified other factors as bearing on the plaintiff's credibility, including discrepancies with specified objective medical evidence of record, minimal treatment for the plaintiff's shoulder pain following surgery and physical therapy, and a notation by Dr. Totta that the plaintiff had no primary care physician and was using only Motrin or Advil to address pain and was feeling better when moving. *See id*. The plaintiff does not address these other bases for a negative credibility finding. *See* Statement of Errors at 5.

In these circumstances, the administrative law judge's credibility assessment stands.

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be ***VACATED*** and the case ***REMANDED*** for further proceedings consistent herewith.

---

[8] The plaintiff complains that "[e]ssentially, the ALJ found that anyone who is receiving Workers' Compensation benefits has questionable credibility without any other evidence – other than receipt of those benefits." Statement of Errors at 5. As noted above, that is not the case here. A treating provider indicated that the *plaintiff* had concerns regarding loss of benefits. *See* Record at 447.

## NOTICE

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 13th day of January, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge